**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) |
| | ) |
| Plaintiff, | ) ) Civil Action No. 11-2184 |
| v. | ) ) |
| BIG LOTS STORES, INC., | ) ) |
| Defendant. | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

      Defendant Big Lots Stores, Inc. ("Defendant" or the "Company"), by its attorneys,

hereby submits this Statement Of Material Facts in support of its Motion For Summary Judgment

on the claims of Plaintiff Equal Employment Opportunity Commission ("Plaintiff" or "EEOC").

      1.      Big Lots is the nation's largest broad line closeout retailer. (*See* Big Lots'

Associate Handbook, attached as Group Ex. 10, at 4.)[1] It sells a broad range of high-quality,

brand-name products. (*Id*.)

      2.      Big Lots operates Store No. 1546 in Fort Smith, Arkansas. (*See* Declaration of

Robert Muntz ("Muntz Decl."), attached as Ex. 2, ¶ 1.) From January 2008 through July 2010,

Robert Muntz served as the Manager for Store No. 1546. (*Id.,* ¶ 1.)

      3.      During this time period, Ken Liberton served as the District Manager, Anthony

Brock served as the Regional Human Resources Manager (RHRM), and Alan Rasmussen served

as the Regional Associate Relations Manager (RARM). (Ex. 2, ¶ 4.)

---

[1] References to "Ex." refer to exhibits included in Defendant's Appendix of Exhibits, filed
concurrently herewith.

4.       Each store also might have one or more Assistant Managers and multiple Associate Managers.  The Manager or an Assistant Manager is always on duty.  (*See* Excerpts of Deposition of Lacey Deaton  ("Deaton Dep."), attached as Ex. 3 at 57:8-23.)  Assistant Managers are hourly workers who lack the authority to hire, fire, promote, demote, transfer or discipline employees without approval.  (Ex. 2, ¶ 5.)  Associate Managers are hourly, non-exempt employees without the authority to hire, fire, promote, demote, transfer, or discipline other employees on their own.  Associate Managers and Assistant Managers likewise lack the authority to set store or employee schedules.  (*Id.*)  All store associates at Store No. 1546 reported directly to the Manager.  (*Id.*)

### *Defendant's Harassment-Free Environment Policy And Training*

5.       Big Lots maintains a Harassment-Free Environment Policy.  (Ex. 2, ¶¶ 2, 6.)  The Harassment-Free Environment Policy states that the company "intend[s] to maintain an environment in which all associates can perform their duties free of harassment and discrimination" and has "zero tolerance" for any conduct that creates an offensive, intimidating, or hostile work environment.  (*See* Ex. 10, at 19-20.)  Big Lots' Standards of Conduct specifically prohibits violations of the Harassment-Free Environment Policy.  (*Id.* at 21.)

6.       The Harassment-Free Environment Policy requires employees to report violations of the Policy, and it outlines specific Reporting Procedures for employees to report inappropriate conduct:

> The following steps have been put into place to ensure the work environment at Big Lots is respectful, professional, and free of harassment.  If you believe someone has violated this Harassment-Free Environment policy, you should promptly bring the matter to the immediate attention of your Manager or Regional Human Resources Manager (RHRM).  If you make a complaint under this policy and have not received a satisfactory response, you should contact the Vice President of Associate Relations immediately or call the **GET REAL HOTLINE at 1.866.834.REAL (7325)**.

(Ex. 10, at 20.)

       7.     The Policy also assures employees that the company will investigate reports in a

confidential manner and forbids retaliation against any employee who reports misconduct:

> All reports of inappropriate conduct or discrimination will be promptly
> investigated under the direction of the Human Resources Department.  All
> investigations will be conducted with the utmost concern for the confidential and
> personal nature of the allegation. . . . Retaliation against anyone reporting acts of
> harassment will not be tolerated.

(Ex. 10, at 19.)

       8.     Big Lots also maintains an "open door" policy that directs employees that:

> Good communication is essential for building a positive and productive work
> environment. . . . You may express your opinions and concerns or ask questions
> relating to your job and the Company.  If you have a question or concern at any
> time during your employment, feel free to contact your Manager or District
> Manager.  If you are uncomfortable discussing the issue with either of them,
> contact your Regional Human Resources Manager (RHRM), Regional Associate
> Relations Manager (RARM), or call the **GET REAL Hotline at 1-866-834-**
> **REAL (7325).**

(Ex. 10, at 30.)

       9.     Each store has a break room where employees keep their personal belongings,

take breaks, eat, and watch training videos.  (Ex. 2, ¶ 10; *see* Declaration of Richard Parker

("Parker Decl."), attached as Ex. 1, ¶ 8.)

       10.    Big Lots widely distributes the Policy in its Associate Handbook.  Big Lots

requires new employees to sign Acknowledgements that they received, reviewed, and agree to

follow the Policy.  (Ex. 2, ¶¶ 6-7.)

       11.    Big Lots posts the Policy at Store No. 1546 in the employee break room, along

with a notice informing employees that "Sexual Harassment Is Illegal" and notices regarding the

"Get Real" Program, including the toll-free Get Real Hotline.  (Ex. 2, ¶ 11; Ex. 1, ¶¶ 8-9.)  These

policies were in place, and these notices were posted, during Claimants' employment with Big Lots.  (Ex. 1, ¶ 9.)

12.     Big Lots provides its Managers and other employees training about sexual harassment prevention and equal employment opportunity laws.  (Ex. 1, ¶¶ 5-6; Ex. 2, ¶ 2.)  For example, Big Lots provides Managers and other employees ongoing harassment prevention training in connection with district team meetings coordinated by District Managers.  (*Id.*; Ex. 4 at 13:15-14:9.)  Further, Big Lots requires Managers and other employees to complete computer-based training (or "TBT") regarding sexual harassment that lasts approximately 2 hours and 15 minutes at least once every two years.  (*See* Excerpts of Technical Based Training and Big Lots Mastery Challenge Quiz, attached as Ex. 37; *see* Ex. 1, ¶ 6; Ex. 2, ¶¶ 2, 17.)

13.     Big Lots provides new-hire orientation that includes training on Big Lots Harassment-Free Environment Policy and the Get Real Hotline.  (*See* Ex. 2, ¶¶ 6-9.)  Big Lots provides additional information and training to reinforce its Policy through "Shrink Rap" discussions, "huddle" meetings, and "Get Real" training.  (*See* Ex. 2, ¶¶ 12-13; *see* Ex. 3 at 66:19-21; 67:1-2; 68:1-7; 80:19-25; 81:1-6.)

14.     "Shrink Rap" is a weekly discussion guide used to educate employees about important topics and current issues.  (Ex. 2, ¶ 13.)  Employees read a lesson in the discussion guide, participate in a discussion group with other employees, and then sign a spiral-bound notebook to acknowledge their attendance.  (*Id*. ¶¶ 12-13.)  In or about September 2009, the "Shrink Rap" training reminded employees to "Follow our Harassment-Free Environment Policy."  (*Id*. ¶ 15.)  Muntz reviewed this lesson with employees at Store No. 1546.  (*Id.*)

15.     The lesson stated:

**Goal:** Protect each other's well-being.  Review our Harassment-Free Environment Policy.

**We won't take it.**  Big Lots has zero tolerance when it comes to harassment of job applicants, contractors, associates, and customer by another associate, supervisor, vendor, customer, or any third party.

**Everyone's protected.**  Our Harassment-Free Environment Policy prevents anyone from being harassed, insulted, degraded, or exploited for any reason. . .

**It's no joke.**  Even comments made in a teasing fashion are unacceptable and a violation of our policy.

(Ex. 3 at 74:1-77:10; *see* Shrink Rap Training for July-September 2009, attached as Group Ex. 11 at Week 11.)

16.     Big Lots also instructs the Manager of each store to hold beginning-of-shift "huddle" meetings with team members.  (*See* Ex. 2, ¶¶ 13-14.)  In June 2009, Big Lots provided talking points for its Managers and "meeting questions" that covered sexual harassment prevention.  (*See id.* ¶ 16.)  The Manager at Store No. 1546 covered these talking points and questions with the Store associates.  (*Id.*)

17.     For example, the June 2009 talking points provide:

As outlined in Big Lots' Harassment-Free Environment Policy, we intend to maintain an environment in which all associates can perform their duties free of harassment or discrimination.  Likewise, it's the responsibility of every associate to comply with this Policy and report any violations. . . .

\*\*\*

**Who can I talk to if I feel someone has violated the Harassment-Free Environment Policy?**

•      Store Manager or;

•      DM, RHRM/RARM

•      GET REAL Hotline at 1-866-834-REAL (7325)

(*See* Handout titled "Harassment Prevention Training for Associates," attached as Ex. 12, at BLS2633.)

18.      Big Lots instructs employees about the Get Real Hotline, an anonymous toll-free number that employees can use to report inappropriate conduct or other problems.  (*See* Ex. 2, ¶¶ 8-10.)  It posts the number and also distributes materials – including a pamphlet and table tents – in employee break rooms that direct employees to call the Get Real Hotline "toll free, all day, every day" if they see a situation causing loss or harm, including inappropriate conduct.  (*See* Ex. 2, ¶ 11; Ex. 1, ¶¶ 8-9; Ex. 3 at 78:10-12, 15-18; 80:25; 81:1-6; *see* GET REAL Pamphlet, attached as Ex. 20; *see* Harassment Prevention table tent, attached as Ex. 38.)  The Get Real pamphlet states:

> We understand that there are times when it is uncomfortable talking about your concerns face-to-face.  For those times, we offer the GET REAL Hotline. . . . Use the GET REAL Hotline even if you only suspect that there might be a problem. Investigations are handled quietly, and your call may stop a bad situation from becoming worse.

(Ex. 20.)

19.      Employees can use the Hotline to report violations of company policy or anything else that negatively impacts them or their co-workers.  (Ex. 3 at 77:11-78:7.)

20.      During the Claimants' employment, Big Lots utilized these programs at Store No. 1546 and also posted telephone numbers for the District Manager, the Regional Human Resources Manager, and the Get Real Hotline at the Store.  (Ex. 2, ¶¶ 9-17; Ex. 1, ¶¶ 8-9.)

### *Lacey Deaton's Employment With Big Lots*

21.      Big Lots hired Lacey Deaton on December 8, 2007 as a temporary part-time sales associate.  (Ex. 3 at 48:17-49:15; *see* Big Lots Action Request Form, attached as Ex. 13.)

22.      When Deaton was hired, she received a copy of the Big Lots Associate Handbook.  She read and familiarized herself with the information in the Handbook, and she

agreed to abide by the company rules and policies contained therein.  (Ex. 3 at 63:16-64:25; *see* Associate Handbook Acknowledgment Form dated December 8, 2007 and signed by Lacey Deaton, attached as Ex. 14.)

23.     A few months later, on February 5, 2008, Deaton received another copy of the Big Lots Associate Handbook.  (Ex. 3 at 81:12-82:10.)  She again read the  Associate Handbook in its entirety and acknowledged that she was responsible for complying with the policies and rules set forth therein.  (Ex. 3 at 82:8-83:5; *see* Acknowledgment of Receipt of Associate Handbook dated February 5, 2008 signed by Lacey Deaton, attached as Ex. 15.)

24.     With her receipt of the Big Lots Associate Handbook on or about February 5, 2008, Deaton also received a copy of the Harassment-Free Environment Policy.  She read the Harassment-Free Environment Policy, understood it, and agreed to follow it.  (Ex. 3 at 83:22-84:6.)

25.     Deaton signed an acknowledgment to that effect:  "I acknowledge I have received a copy of Big Lots' Harassment-Free Environment Policy (the 'Policy') contained in the Associate Handbook – Stores.  I have read the Policy, understand it, and agree to follow it.  I understand that it is my obligation . . . to report conduct which I believe violates the Policy to enable the company to take action as appropriate."  (*See* Acknowledgment of Receipt of Harassment-Free Environment Policy dated February 5, 2008 signed by Lacey Deaton, attached as Ex. 16.)

26.     Several months later, on July 29, 2008, Deaton received another copy of the Harassment-Free Environment Policy.  (Ex. 3 at 105:23-107:1.)  She again read the Policy, understood it, agreed to follow it.  (*Id.*)  Deaton signed another acknowledgement to that effect: "I acknowledge I have received a copy of Big Lots' Harassment-Free Environment Policy (the 'Policy') contained in the Associate Handbook – Store.  I have read the Policy, understand it, and

agree to follow it."  (Ex. 3 at 106:2-107:11; *see* Acknowledgment of Receipt of Harassment-Free Environment Policy dated July 29, 2008 signed by Lacey Deaton, attached as Ex. 17.)

27.     Deaton was familiar with Big Lots' Harassment-Free Environment Policy.  She understood that the Policy provided for a harassment-free workplace and required her to report any harassment or violations of the Policy to enable the company to take action.  (Ex. 3 at 84:7-17; 86:3-18, 87:8-11; 91:25-92:7.)

28.     Deaton also understood that the company had a procedure in place for reporting harassment and that she had multiple ways to report harassment, including by speaking to her Manager, her District Manager, the Regional Human Resources Manager, or calling the Get Real Hotline.  (Ex. 3 at 89:4-18; 90:12-91:1.)

29.     Deaton also knew how to contact her District Manager and Regional Human Resources Manager and, in fact, contacted each of them during her employment.  (Ex. 3 at 186:11-25; 189:25-190:10, *see* Ex. 24.)

30.     Deaton completed additional training that covered Big Lots' sexual harassment policy and reporting procedures.  When Deaton was hired, she watched a video regarding sexual harassment and how to report it, and she received training regarding use of the company's Get Real Hotline.  (Ex. 3 at 68:1-69:18; 77:19-81:6; *see* Store Associate Training Checklist, attached as Ex. 18; *see* Safety Certification Quiz completed by Lacey Deaton, attached as Ex. 19; *see* GET REAL Pamphlet, attached as Ex. 20.)

31.     Throughout her employment, Deaton completed "Shrink Rap" training on a weekly basis.  (Ex. 3 at 70:11-73:1.)  In September 2009, Deaton completed "Shrink Rap" training that reminded her to "Follow our Harassment-Free Environment Policy."  (Ex. 3 at 74:1-77:10; *see* Ex. 11.)

32.     Deaton also completed training regarding use of the Get Real Hotline.  (Ex. 3 at 80:25-81:6.)  She learned that any employee could use the Get Real Hotline to report inappropriate conduct or other problems.  (*Id.*)  She received materials directing her to call the Get Real Hotline "toll free, all day, every day" if she saw a situation causing loss or harm, including inappropriate conduct.  (Ex. 3 at 78:10-25; 79:1-13; Ex. 20.)  Deaton understood that she could use the Get Real Hotline to report violations of company policy or anything else that negatively impacted her or her co-workers, including inappropriate conduct.  (Ex. 3 at 77:11-78:7; 79:6-9.)

### *Alleged Harassment Concerning Deaton*

33.     On July 14, 2009, Big Lots received an anonymous report through its Get Real Hotline that, in part, concerned Deaton.  (*See* July 14, 2009 Get Real Hotline Report, attached as Ex. 21; *see* Excerpts of Anthony Brock's Deposition Testimony ("Brock Dep."), attached as Ex. 4, at 25:13-22; *see* Excerpts from Ken Liberton's Deposition Testimony ("Liberton Dep."), attached as Ex. 6, at 31:20-32:13.)  The reporter alleged that Manager Robert Muntz "propositioned" Deaton by offering her $100 to take a photo of her breasts.  (*See* Ex. 21.)  The report also contained an additional unrelated allegation regarding Muntz, and several unrelated allegations regarding Associate Manager Brandon Boren, including that he spent time with his girlfriend during working hours.  (*Id.*)

34.     Big Lots immediately launched a confidential investigation.  (Ex. 4 at 22:10-13; 23:1-7.)  On July 14, 2009, Big Lots assigned Anthony Brock, Regional Human Resources Manager, to investigate.  (*Id.*)  Brock interviewed Deaton, and she told Brock about the $100 comment.  (Ex. 3 at 119:20-120:19; Ex. 4 at 29:6-10.)  Ken Liberton, District Manager, came to the Store about three days later.  (Ex. 3 at 120:24-121:15.)  Muntz denied the allegation.  (Ex. 6 at 44:11-21.)

35.     Alan Rasmussen, Regional Associate Relations Manager, interviewed the two individuals – Anthony Needham and Rotera Blocker – identified as the potential witnesses to the alleged conduct involving Boren and Muntz.  (*See* Excerpts from Alan Rasmussen Deposition Testimony ("Rasmussen Dep."), attached as Ex. 5 at 41:5-8.)  Rasmussen attempted to contact three additional persons – one (Dawn Downey) who may have spoken to Deaton about Muntz's comment and two (Darrell Spurlin and Thomas Hicks) who may have witnessed Boren's behavior.  (*Id.* at 41:9-14; 57:3-12.)  Despite repeated attempts, however, Rasmussen was not able to reach these individuals.  (*Id.* at 43:8-9; 44:16-18; 57:3-12.)  Rasmussen left messages for Downey on four different days, tried to reach Spurlin on three separate occasions, and he left Hicks messages on two separate occasions.  (*See* Email correspondence dated August 7, 2009, from Alan Rasmussen to Anthony Brock, attached hereto at Ex. 39, at BLS2302.)  Although the witnesses corroborated misconduct involving Boren allowing his girlfriend access to secured areas, none of them could substantiate the allegation regarding Muntz and Deaton.  (*Id.*; Ex. 5 at 53:6-14; 56:9-14.)

36.     Brock nevertheless decided to issue disciplinary counseling to Muntz.  (Ex. 4 at 49:13-15; 54:1-4, 17-25; 55:1.)  Although the proposition to Deaton was not corroborated, Brock determined that the allegations brought Muntz's leadership into question.  (*See* Big Lots Disciplinary Counseling dated September 1, 2009 to Robert Muntz, attached as Ex. 22.)  The counseling stated:  "It . . . has the effect of eroding the confidence imposed in Robert as a leader, to ensure his actions, as well as the actions of his subordinate managers are stellar.  Robert will benefit from ensu[r]ing future interactions are clearly driven by our legitimate business needs, as well as instilling the same in his subordinates."  (*Id.*)

37.     On September 1, 2009, Liberton communicated the counseling to Muntz and notified Deaton of the outcome of the investigation.  (Ex. 6 at 47:7-13, 23-25; 48:1-6.)

38.     Liberton instructed Deaton to call him if the situation ever came up again.  (Ex. 3 at 121:20-24; 188:12-21.)  Deaton thanked Liberton for moving so quickly to take care of the situation and asked him to thank Human Resources for moving so quickly.  (Ex. 3 at 122:4-7; Ex. 6 at 42:11-24.)

39.     Thereafter, over the next several months, Liberton followed up with Deaton on at least two occasions, and as late as June 8, 2010, Deaton did not raise any additional concerns.  (Ex. 3 at 145:4-146:18; Ex. 6 at 57:4-11.)

40.     On September 3, 2009, Deaton received a promotion from part-time cashier to full time Customer Service Specialist.  (*See* Big Lots Action Request Form, attached as Ex. 32; Ex. 3 at 129:14-130:10.)  Deaton received a change from part-time to full-time status, a pay increase from $7.27 to $8.36 per hour, health insurance, and the option to participate in the company's 401(k) plan.  (*Id.*)

41.      Following Deaton's conversation with Brock, Muntz did not make any allegedly inappropriate comments to her for eight or nine months, until March or April 2010.  (Ex. 3 at 125:4-17.)

42.     Deaton contends that, in March or April 2010, Muntz approached her and said, "I don't understand why you won't show me your breasts, you're acting like I'm asking you to bring down the world."  (Ex. 3 at 133:7-11.)  Deaton contends that Muntz made the comment two or three times over a two or three month period, until she "got fed up again and reported it again."  (Ex. 3 at 133:14-21.)  Deaton also contends that Muntz paid her compliments, such as saying that her eyes or hair looked good, maybe once a week, and that he also asked her if her breasts were fake.  (Ex. 3 at 209:15-214:11.)

43.     Although Deaton contends that Muntz made comments to her around the service desk, she cannot identify anyone who allegedly witnessed them.  (Ex. 3 at 134:10-22.)  When

11

Deaton allegedly "got fed up" with Muntz's alleged comments, she contacted Liberton.  (Ex. 3 at 133:14-21; *see* Email correspondence dated July 23, 2010,  attached as Ex. 23.)

44.     On Friday, July 23, 2010, Deaton sent Liberton an e-mail message from someone else's account stating that she had an upsetting "situation on [her] hands" and asking if she could "get a week off with pay."  (*See* Ex. 23.)

45.     Liberton replied by e-mail message asking Deaton to call him.  (*Id.*)

46.     On Sunday, July 25, 2010, Deaton sent another e-mail message stating "Its me lacey again. . . . I'm emailing you because I really need to know what I need to do about my work week."  (*See* Correspondence dated July 25, 2010, attached as Ex. 24.)

47.     Liberton again responded by e-mail.  Liberton asked Deaton to call him and asked Deaton to meet him at the store the following day.  (*Id.*)

48.     On Monday, July 26, 2010, Liberton drove 192 miles to Fort Smith.  (Ex. 6 at 64:1-5, 15-18.)  Deaton finally called Liberton as he arrived in Fort Smith.  (Ex. 3 at 159:20-23.) Deaton told Liberton that Muntz had asked her and coworkers Rotera Blocker and Tasha Martinez to show him their breasts.  (Ex. 6 at 67:25; 68:1-8.)

49.     With direction from Brock, Liberton suspended Muntz and launched an investigation.  (Ex. 6 at 73:22-25; 74:1.)  Blocker and Martinez corroborated Deaton's allegations.  (Ex. 6 at 91:12-21.)

50.     On July 31, 2010, Big Lots fired Muntz for violating its Harassment-Free Environment Policy.  (*See* Muntz Termination Notice, attached as Ex. 33.)  Muntz's termination ended any harassment, and Deaton testified that she was satisfied with the resolution.  (Ex. 3 at 166:2-8, 18-24.)

51.    The only alleged harassment that Deaton witnessed concerning any other employee involved Muntz hitting a co-worker Rebecca Ehrlich on the butt with a bag of chips. (*Id.* at 203:22-25; 204:1-3.)

52.    Deaton claims that she did not report Muntz's conduct because she thought her complaint would be futile, *i.e.*, that the company would talk to Muntz again but then leave her in "that situation."  (Ex. 3 at 141:15-142:17.)

53.    Deaton voluntarily resigned from Big Lots on November 22, 2010, because she found another job that paid more and did not require her to work evenings.  (Ex. 3 at 201:3-203:14, 215:11-19.)

### *Tasha Martinez's Employment With Big Lots*

54.    Martinez worked at Big Lots from approximately September 2007 through June 2008 and left when she had her daughter.  (*See* Excerpts from Tasha Martinez Deposition, attached as Ex. 7, at 40:2-10.)  Martinez reapplied on July 17, 2009.  (*See* Martinez's Re-Hire application, attached as Ex. 26.)

55.    Martinez knew that Muntz was the Manager when she reapplied to Big Lots, but she had never had any problems with Muntz before reapplying, and she had never heard about Muntz sexually harassing anyone at Big Lots before she reapplied.  (Ex. 7 at 42:21-43:17.)

56.    Martinez was rehired at Big Lots as a part-time cashier at on September 24, 2009. (Ex. 7 at 44:21-45:5.)  Martinez reported directly to Muntz.  (*Id.* at 34:1-16; 42:21-43:17.)  As a cashier, Martinez spent most of her shifts with customers.  (*Id.* at 55:1-14.)

57.    When Martinez was rehired, she signed an Acknowledgement of Receipt of Associate Handbook.  (*See* Acknowledgment of Receipt of Associate Handbook, attached as Ex. 25; Ex. 7 at 55:17-56:6.)  Martinez agreed:

> I acknowledge that I have received a copy of Big Lots' Associate Handbook – Stores.  I understand I am responsible for reading the contents of the Associate Handbook and for complying with the policies and rules outlined therein. … .I further acknowledge that I have read the Associate Handbook in its entirety in accordance with this responsibility.

(Ex. 25.)

58.     Although Martinez does not recall receiving a copy of the Handbook, she admits that she could have asked for one, that she knew Big Lots had rules, and that she was responsible for following the company's rules.  (Ex. 7 at 57:1-11.)  Martinez knew that sexual harassment was "against the rules" at Big Lots.  (Ex. 7 at 57:17-19.)

59.     When Martinez was rehired on September 24, 2009, she also signed an Acknowledgement of Receipt of the Harassment-Free Environment Policy.  Martinez agreed:

> I acknowledge I have received a copy of Big Lots' Harassment-Free Environment Policy (the 'Policy') contained in the Associate Handbook – Stores.  I have read the Policy, understand it, and agree to follow it.  I understand that it is my obligation . . . to report conduct which I believe violates the Policy to enable the company to take action as appropriate.

(*See* Acknowledgment of Receipt of Harassment-Free Environment Policy, attached as Ex. 27; Ex. 7 at 58:5-10.)

60.     Although Martinez denies actually receiving a copy, she admits that she knew that Big Lots had a policy against sexual harassment, agreed to follow the rules with respect to sexual harassment, and knew that she was required to report sexual harassment.  (Ex. 7 at 58:22-59:9.)

61.     Martinez knew that she was required to report sexual harassment to the District Manager or to the Get Real Hotline, and she knew that she could talk to managers above Muntz and that she could call the Hotline.  (Ex. 7 at 60:7-13; 76:2-12.)

62.     Martinez saw the Get Real Poster hanging in the break room, knew that she could call the Get Real Hotline if she had any problems, and she knew that she could use the Get Real Hotline to report inappropriate conduct.  (Ex. 7 at 40:14-18; 41:2-13; 42:1-5.)

14

### *Alleged Harassment Regarding Martinez*

63.     Martinez contends that Muntz made three comments to her about her breasts. Specifically, she alleges that:  (a) Muntz asked to see her breasts, that she told him "no," and that he said, "you should think about it"; (b) Muntz said, "if Lacey and Rotera showed me theirs, would you?," that she told him "no," and that he said, "well, just think about it"; and (c) Muntz said, "Have you thought about it yet?," that she said, "no, I'm not going to," and he responded, "Just think about it.  Please."  Other than these statements, "that's basically all that was ever said."  (Ex. 7 at 70:17-72:12; 83:13-16.)

64.     Martinez guesses that Muntz probably made the first comment sometime in January 2010, but claims that Muntz "brought up" asking her to show him her breasts every time she worked with him for the "four or five months" before he got fired; that is, from approximately March or April through July 2010.  (*Id.*  at 73:8-19.)  Muntz did not make the statements in front of others, and no one else witnessed any of the comments.  (*Id.*  at 74:5-9.)

65.     Muntz never touched Martinez, and he never did anything in retaliation for Martinez's saying "no."  (*Id.*  at 74:2-4, 113:4-5.)

66.     Martinez never saw or heard Muntz engage in any harassing behavior toward Deaton, and Martinez never witnessed Muntz act inappropriately with any other employee.  (*Id.* at 70:12-16; 83:19-21; 85:22-86:2.)

67.     Before Martinez spoke with Liberton in July 2010, Martinez never reported any of Muntz's inappropriate comments to the company, and she never called the Get Real Hotline.  (*Id.* at 74:20-75:4.)

68.     Martinez did not report the conduct because she was afraid of losing her job.  (*Id.* at 42:6-11; 76:2-15.)  Martinez did not have a specific reason; it was "just the feeling" she had, and she had no other reason to think she might be fired if she complained.  (*Id.* at 42:12-17,

76:16-19.)  She did not know of anyone else who lost his or her job for complaining about sexual harassment or calling the Hotline.  (*Id.* at 42:18-20; 69:8-70:5; 76:2-19.)

69.     On July 26, 2010, Liberton spoke with Martinez during his investigation of Deaton's complaint.  (*Id.* at 74: 16-19; 93:14-16; 99:2-23.)  Martinez told Liberton that Muntz had asked to see her breasts "two to four times."  (*Id.*)  Martinez never saw Muntz at Big Lots after that meeting.  (*Id.* at 107:20-108:17; 113:13-16.)

70.     Although she thinks that the company could have terminated Muntz sooner, there is nothing else that Martinez thinks either Liberton or anyone else at the company should have done to address sexual harassment.  (*Id.* at 113:17-22; 125:16-20.)  Muntz's termination ended any harassment that Martinez experienced.  (*Id.* at 83:10-16; 106:2-6.)

71.     Martinez resigned from Big Lots in April 2012.  Martinez does not claim that her separation from Big Lots resulted from her rejection of any alleged sexual advances by Muntz. (*Id.* at 22:6-13; 74:2-4.)

### *Rebecca Ehrlich's Employment With Big Lots*

72.     Rebecca Ehrlich started working at Big Lots as a part-time stocker on or about March 26, 2010.  (*See* Excerpts from Rebecca Ehrlich Deposition Testimony, attached as Ex. 8, at 21:4-7; 27:5-8.)  Muntz was her supervisor.  (*Id.* at 27:1-4.)

73.     When Ehrlich was hired, she received a copy of the Associate Handbook, she understood that she was responsible for complying with the policies set forth in the Handbook, and she agreed to comply with the policies set forth in the Handbook.  (*Id.* at 37:9-38:10.)

74.     Ehrlich also received a copy of the Harassment-Free Work Environment Policy contained in the Associate Handbook.  She read the Policy, understood it, and agreed to follow it. (*Id.* at 38:14-39:3.)

75.     Ehrlich understood that the Policy prohibited sexual harassment, and she understood that the Policy required her to report sexual harassment and any violations of the Harassment-Free Environment Policy.  (*Id.* at 40:12-20; 41:8-17.)

76.     Ehrlich understood that it was important to report sexual harassment to enable the company to take action.  Ehrlich understood that the company had a procedure for reporting harassment, that she had several ways to report harassment, including by calling the Human Resources Manager, contacting District Manager Liberton, or calling the Get Real Hotline. Ehrlich understood that, if she made a complaint under the Policy and did not receive a satisfactory response, she could call the Get Real Hotline.  (*Id.* at 36:3-37:8, 43:2-44:12.)

77.     Ehrlich also understood that the Policy required the company to investigate allegations in a confidential manner and prohibited retaliation against anyone who reported harassment.  (*Id.* at 41:18-43:1.)

78.     Ehrlich completed additional training that covered Big Lots' sexual harassment policy and reporting procedures.  (*Id.* at 34:10-36:2.)  During orientation, the company informed Ehrlich that it prohibited and had a "zero tolerance" policy for sexual harassment and explained each poster in the break room, including a poster containing the Harassment-Free Environment Policy and a poster containing the Get Real Hotline.  (*Id.*)  Muntz told Ehrlich that she had an obligation to report sexual harassment and that she could do so in multiple ways.  (*Id.*)  Ehrlich also reviewed a pamphlet that directed her to call the Get Real Hotline "toll free, all day, every day" if she saw a situation causing loss or harm, including inappropriate conduct.  (*Id.* at 48:7-15; *see* Ex. 20.)

79.     Throughout her employment, Ehrlich completed "Shrink Rap" training on a weekly basis by reviewing a lesson in the spiral-bound "Shrink Rap" book, discussing it in a group, reading it, and then signing off.  (Ex. 8 at 44:21-45:14.)  Ehrlich completed "Shrink Rap"

training that covered the Get Real Hotline, including a lesson in May 2010 that reminded her to "Call the Get Real Hotline to report major events" and a lesson that reminded her to "call the Hotline toll-free 24 hours a day to report dishonesty, unsafe situations or violations of company policy."  (Ex. 8 at 45:17-47:15; *see* Shrink Rap Training for April-June 2010, attached as Ex. 36, at Weeks 5 and 7.)  Ehrlich understood that she could call the Hotline even if she only suspected a problem.  (Ex. 8 at 49:13-15.)

80.     Ehrlich considered sexual harassment a major event and a violation of company policy.  (*Id.* at 46:14-21; 34:13-17; 40:12-15.)

### Alleged Harassment Involving Ehrlich

81.     About the third week after Ehrlich started working at Big Lots, Muntz allegedly asked to see "body parts" by stating "if you show me yours, I'll show you mine." (Ex. 8 at 52:7-24; 54:1-55:3.)  Ehrlich testified that Muntz asked the question throughout the store, but no one else was present and she does not know of anyone who heard the comment.  (*Id.*)

82.     Another time, Muntz allegedly asked her to "wear a specific pair of shorts to work because it made [her] butt look nice," and that he "was always lurking around the corner just watching [her] work." (*Id.* at 55:4-17.)  She does not know when he made the comment and cannot identify anyone who heard it.  (*Id.* at 55:4-23.)

83.     Ehrlich contends that, on another occasion, Muntz wrapped his arms around her from behind and said "do you mind if I touch these," without touching her breasts.  (*Id.* at 61:2-12.)

84.     She also asserts that, on one occasion, Muntz "slapped [her] butt with a bag of chips" on his way out of the store.  (*Id.* at 58:22-24; 59:9-19.)  Ehrlich contends that she was standing in the front of the store and three people – Kyla, Steven, and possibly Deaton – were present.  (*Id.* at 59:1-8.)

85.     Ehrlich did not report any of the allegedly harassing conduct to the company.  (*Id.* at 64:16-65:11.)  She did not complain about harassment to the company, she did not contact Human Resources about any of the conduct, she did not tell Liberton about any of the conduct, and she did not call the Get Real Hotline.  (*Id.*)

86.     Ehrlich claims that she did not report the conduct because of a conversation she had with Deaton.  (*Id.* at 65:12-68:21.)  Ehrlich claims that Deaton told her that, before Ehrlich's employment with the company, Deaton spoke to Anthony Brock in Human Resources but Brock did not take any action.  (*Id.*)  Ehrlich does not know what Deaton reported, does not know what Brock or Liberton did in response to any report, does not know whether the company investigated, and does not know whether Muntz was disciplined.  (*Id.* at 66:6-69:1.)

87.     Ehrlich also was instructed to "quit gossiping" in the Store and "get back to work," but no one ever told her not to report sexual harassment, no one threatened to fire her, and she never saw anyone else get fired for complaining.  (*Id.* at 68:17-24; 69:1-5; 119:22-120:19.)

88.     Ehrlich's employment with Big Lots ended around July 17, 2010.  (Ex. 8 at 49:16-24.)  Ehrlich was terminated for job abandonment.  (*Id.*)  Whereas Ehrlich disputes that she abandoned her job, she attributes her termination to a miscommunication.  (*Id.* at 50:4-51:1.)  She does not claim that her separation resulted from her rejection of any alleged sexual advances by Muntz.  (*Id.*)

### *Kathryn Lewis' Employment with Big Lots*

89.     Lewis began working for Big Lots on July 27, 2009 as a part-time employee.  (*See* Excerpts from Kathryn Lewis Deposition, attached as Ex. 9, at 25:14-18.)  She was hired as a cashier.  (*Id.* at 26:2-4.)  In 2010, she also started working as a stocker.  (*Id.* at 26:11-12; 16-17.)  She reported directly to the Manager, Muntz.  (*Id.* at 25:21-24; 26:1.)

90.     When Lewis was hired, she signed an Acknowledgment of Receipt of Associate Handbook.  (*See* Acknowledgment of Receipt of Associate Handbook dated July 27, 2009 and signed by Kathryn Lewis, attached as Ex. 28; Ex. 9 at 36:3-10.)  The form provided that she acknowledged that she "received a copy of Big Lots Associate Handbook – Stores" and understood that she was "responsible for reading the contents of the associate handbook and for complying with the policies and rules outlined therein."  (*Id.*)

91.     Lewis also signed an Acknowledgement of Receipt of Harassment-Free Environment Policy.  (*See* Acknowledgment of Receipt of Harassment-Free Environment Policy dated July 27, 2009 and signed by Kathryn Lewis, attached as Ex. 29; Ex. 9 at 38:3-7.)  The form provided that she "received a copy of Big Lots Harassment-Free Environment Policy (the 'Policy')," that she read the Policy, understood it, and agreed to  follow it.  (*Id.*)

92.     Lewis understood that Big Lots prohibited harassment of any kind and she knew that Big Lots prohibited sexual harassment.  (Ex. 9 at 39:7-9; 40:22-24.)

93.     She understood that she had an obligation to "report conduct which [she] believe[d] violates the Policy to enable the company to take action as appropriate."  (*See* Ex. 29; Ex. 9 at 39:10-13; 41:11-13; 45:11-19.)  Lewis also understood and agreed that, pursuant to Big Lots' Standards of Conduct, failure to report a "Violation of the Harassment-Free Environment Policy" was a terminable offense. (*See* Ex. 10 at p. 21; Ex. 9 at 45:11-19.)

94.     Lewis knew that she had multiple ways to report harassment as outlined in Big Lots' Associate Handbook, including by calling the Regional Human Resources Manager, the Vice President of Associate Relations, or the Get Real Hotline.  (Ex. 9 at 39:14-16; 40:12-24; 43:14-24; 44:1-8; *see* Ex. 10 at p. 20.)  She knew that Big Lots' Get Real Hotline was "[a] toll-free phone number that an associate [could] use to report a problem."  (Ex. 9 at 52:13-17; *see* Safety Certification Quiz completed by Kathryn Lewis, attached as Ex. 19.)

95.     Lewis knew that Big Lots had an anti-retaliation policy and she understood that the Company prohibited retaliation against anyone for reporting acts of harassment.  (Ex. 9 at 41:1-10, 42:11-13; *see* Ex. 10 at 19.)

96.     Further, she knew that it was important to report violations of company policies.  (Ex. 9 at 71:5-9.)  In fact, Lewis contacted District Manager Liberton on multiple occasions to complain about issues other than harassment.  (*See* Ex. 9 at 65-71.)  For example, Lewis complained to Ken Liberton about employees not doing their jobs and she also complained to Liberton that employees were carrying cell phones.  (Ex. 9 at 69:12-17.)

97.     Lewis completed additional training that covered Big Lots' sexual harassment policy and reporting procedures.  For example, Lewis acknowledged that Big Lots provides weekly "Shrink Rap" training and admitted that she signed the Shrink Rap book "on a weekly basis."  (Ex. 9 at 48:6-11, 19-24; 49:1.)  In 2009, the Shrink Rap training reminded employees to "Follow [Big Lots'] Harassment-Free Environment Policy," and to "Call the Get Real Hotline."  (*See* Ex. 11.)  Although Lewis does not recall the entirety of the training, she admits that, at a minimum, she read the titles, including "Follow Our Harassment-Free Environment Policy," and signed the Shrink Rap book.  (Ex. 9 at 50:17-24; 51:1, 52:5-7.)

### *Alleged Harassment Involving Lewis*

98.     Lewis testified that Muntz sexually harassed her on "11 or 12 occasions," beginning sometime after she started working at Big Lots, but she cannot say when.  (Ex. 9 at 63:5-10; 63:24; 64:1-6.)  Lewis claims that Muntz asked her if he could take a picture of her breasts on multiple occasions, tried to look down her shirt, made comments regarding her breasts, and took pictures of her breasts.  (*Id.* at 63:13-15; 83:7-9; 89:16-23; 91:17-20; 93:15-18; 100-107.)  No one witnessed these incidents, and Lewis did not report them to the company.  (*Id.* at 64:12-13; 65: 16-17; 83: 23-24; 85:9-10; 90:10-11; 91:8-9; 91:17-20; 93:15-18; 107:13-21.)

99.     Lewis claims that, on one occasion, a co-worker walked around the corner when Muntz reached around her from behind and grabbed her breasts but she immediately knocked Muntz's hands away.  (Ex. 9 at 86:8-10; 87:1-4; 87:7-9.)  Lewis also claims that Muntz invited her and a co-worker to his house for a topless swimming party but she "thought he was joking" so she "blew it off."  (*Id.* at 118:6-9, 119:18-23.)

100.    Lewis claims that Muntz sent her a nude photograph and that she told Steve Edgerton about this single incident -- but not until after Muntz already had been terminated.  (Ex. 9 at 173:24; 174:1-3.)

101.    Lewis claimed that when she rejected Muntz's advances, he "was mean when he talked to [her]."  (Ex. 9 at 100:3-8.)  She also claimed he scheduled her for fewer hours over some unspecified period of time.  (*Id.* at 100:3-8; 110:6-10, 15-22.)  However, she admits that there could be other reasons that her scheduled hours changed -- reasons that had nothing to do with the alleged sexual harassment.  (*Id.* at 116:2-5.)

102.    Any purported change in Lewis's *scheduled* hours did not significantly affect her *actual* hours worked or her take home pay.  (Ex. 9 at 113:6-11.)  Specifically, Lewis testified that she "would get hours bumped back up" when Muntz and others called her to work extra shifts.  (*Id.* at 113:10-18.)  Thus, in addition to being scheduled at least two shifts per week, she would pick up extra shifts at least three days a week and "sometimes . . . [she] would wind up . . . work[ing] seven days a week."  (*Id.* at 114:18-24; 115:1-4.)

103.    Lewis never complained to Big Lots that she was sexually harassed.  (Ex. 9 at 65:16-17; 85:9-10; 88:14-16; 91:8-9; 119:2-4; 107:10-21; 119:18-23.)  During her employment with Big Lots, Lewis has seen District Manager Liberton at the store about once per month.  (*Id.* at 59:17-19.)  He also has called the store, and Lewis has spoken with him "whenever she had a problem."  (*Id.* at 59:17-24; 60:24; 61:1-4.)  Lewis also has contacted Liberton's supervisor, Bill

22

Coney, Regional Vice President, to complain about Liberton bringing in additional workers.  (*Id.* at 67:3-11; 75:1-76:16.)  However, she never brought any alleged sexual harassment to Big Lots' attention.  (*See id.* at 82:23-24; 83:1-2; 172.)

104.    Lewis claims that she did not report sexual harassment to the company because she previously had reported other employees for using cell phones, and the company had ignored the complaints, so she "stopped complaining."  (Ex. 9 at 65:18-68:11; 78:8-15.)

105.    Lewis admits that sexual harassment was more serious than other complaints she made, and she does not know what steps the company took to investigate or address her other concerns.  (*See id.* at 82:23-24; 83:1-2; 172; 133:1-135:11.)  She also admits that, in response to her complaint about cell phone usage, Big Lots followed up with her and took action, including creating a sign to address cell phone usage and hanging it on the break room door.  (Ex. 9 at 78:8-24; 80:10-14; 82:23-24, 83:1-2.)  Further, Lewis testified that she continued complaining on a weekly basis regarding cell phone usage through July 2011, nearly a year after Muntz's termination.  (*Id.* at 133:15-135:11.)

106.    Lewis testified that Muntz's termination ended any sexual harassment she experienced.  (Ex. 9 at 117:9-11.)  She admits that Muntz could have been terminated earlier if someone had reported the conduct.  (*Id.* at 117:15-17.)

**Charge & Lawsuit**

107.    Lacey Deaton filed a charge of discrimination with the EEOC on September 28, 2010.  (*See* EEOC Charge, attached as Ex. 30; Ex. 3 at 122:24-25; 123: 2-10.)

108.    A year later, on September 28, 2011, the EEOC filed suit against Big Lots in this Court.  (Dkt. No. 1.)  The EEOC alleges that Big Lots subjected Lacey Deaton and a class of female employees to sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a).  (*Id.*)

109.    The EEOC is pursuing relief for four individuals – Deaton, Martinez, Ehrlich, and

Lewis.  (*See* EEOC Response to Interrogatory No. 9, attached as Ex. 31.)


**DATED:  October 11, 2012**                          Respectfully submitted,

                                                      BIG LOTS STORES, INC.


                                                      By:   /s/ Gerald L. Maatman, Jr.
                                                            One of Its Attorneys

Gerald L. Maatman, Jr., *gmaatman@seyfarth.com*
Christopher J. DeGroff, *cdegroff@seyfarth.com*
Jennifer A. Riley, *jriley@seyfarth.com*
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (fax)

Robert J. Carty, Jr., *rcarty@seyfarth.com*
SEYFARTH SHAW LLP
700 Louisiana Street, Suite 3700
Houston, TX  77002-2797
(713) 860-0059
(713) 821-0643 (fax)

*Attorneys for Defendant Big Lots Stores, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

Gerald L. Maatman, Jr., an attorney, certifies that on October 11, 2012, he caused a true and correct copy of the foregoing **DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** to be filed with the Clerk of the Court using the Court's CM/ECF System, which will send notification of such filing to all attorneys of record, including the following:

> Faye A. Williams, *faye.williams@eeoc.gov*
> Joseph M. Crout, *joseph.crout@eeoc.gov*
> Kenneth Pershawn Anderson, *kenneth.anderson@eeoc.gov*
> Markeisha K. Savage, *markeisha.savage@eeoc.gov*
> Equal Employment Opportunity Commission
> Memphis District Office
> 1407 Union Ave., Suite 901
> Memphis, Tennessee  38104
> Telephone:  (901) 544-0136
>
> Pamela B. Dixon, *pamela.dixon@eeoc.gov*
> Equal Employment Opportunity Commission
> 820 Louisiana Street
> Suite 200
> Little Rock, AR 72201
> Telephone:  (501) 324-6474

> /s/  Gerald L. Maatman, Jr.
> Gerald L. Maatman, Jr.

14900410v.4